UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------- x
MICH & MICH TGR, INC.,            :

                                :

             Plaintiff,       :

                                :

    -against-            :  **MEMORANDUM AND ORDER**

                                :

                                :  No. 14 Civ. 5758 (KAM)(AKT)
BRAZABRA, CORP.,             :

                                :

             Defendant.      :
-------------------------------------- x
**MATSUMOTO, United States District Judge:**

        Mich & Mich TGR, Inc. ("plaintiff") commenced this

action alleging that defendant Brazabra, Corp. ("defendant" or

"Brazabra") are infringing upon plaintiff's "Bra Strap

Retainer," U.S. Reissue Patent No. 43,766 by, *inter alia*,

knowingly and willingly importing into the United States,

selling, and causing to be sold, and offering for sale within

this judicial district and elsewhere, retainers for brassiere

straps that infringe upon plaintiff's patents without

plaintiff's permission or authorization. (ECF No. 1, Complaint

("Compl.") ¶¶ 8-11, dated October 1, 2014.)[1] Plaintiff seeks

injunctive relief requiring defendant and its agents to cease

production, advertising and sale of the alleged infringing

product, as well as destruction of all products infringing upon

---

[1] Plaintiff filed an initial complaint on May 11, 2014, which plaintiff
voluntarily dismissed on October 1, 2014 due to a defect in subject matter
jurisdiction in that the wrong plaintiff was named. (Case No. 14-CV-2974.)
On October 1, 2014, plaintiff refiled its complaint under the same caption,
changing only the named plaintiff.

plaintiff's patents.  (Compl. ¶ B.)  Plaintiff also seeks an
accounting of defendant's profits from the sale and resale of
the allegedly infringing product, in order that plaintiff may be
compensated, as well as attorney's fees and costs, and treble
damages.  (Compl. ¶¶ C-F.)

Presently before this court is defendant's motion for
summary judgment to dismiss all of plaintiff's claims pursuant
to Federal Rule of Civil Procedure ("Rule") 56, and plaintiff's
opposition thereto.  (ECF No. 11, Defendant's Motion for Summary
Judgment and Statement of Material Facts Pursuant to Rule 56.1
("Mot. and Rule 56.1 Stmt."); ECF No. 12, Defendant's Memorandum
in Support of Motion for Summary Judgment ("Def. Mem."); ECF No
13, Declaration of Theodore Davis in Support of Motion for
Summary Judgment ("Davis Decl."; ECF No. 14, Declaration of
Scott Spencer in Support of Defendant's Motion for Summary
Judgment ("Spencer Decl."); ECF No. 15, Plaintiff's Opposition
to Defendant's Motion for Summary Judgment ("Pl. Opp."),
Plaintiff's Rule 56.1 Statement ("Pl. 56.1 Stmt."), Plaintiff's
Supplemental Claim Construction ("Pl. Claim Constr."),
Declaration of Joseph Dunne in Support of Plaintiff's Opposition
to Defendant's Motion for Summary Judgment ("Dunne Decl."); ECF
No. 16, Defendant's Reply in Support of Its Motion for Summary
Judgment ("Def. Reply"); Reply Declaration of Scott Spencer in
Support of Defendant's Motion for Summary Judgment ("Spencer

Reply Decl."); ECF 23, Defendant's Supplemental Letter re New Caselaw dated February 18, 2015("Def. Ltr."); Oral Argument Transcript dated February 12, 2015 ("Oral Arg. Tr.").) Defendant contends that its product does not literally infringe the '766 patent, that plaintiff is estopped from alleging a theory of infringement under the doctrine of equivalents and, in any event, any claim of equivalence is meritless. Upon consideration of the parties' submissions and oral argument, for the reasons set forth below, defendant's motion for summary judgment of non-infringement is granted.

<u>**BACKGROUND**</u>

Plaintiff is the owner by assignment of the U.S. Reissue ("RE") Patent No. 43,766 for a Bra Strap Retainer (the "'766 patent"), issued on October 23, 2012. The '766 patent, or the patent-in-suit, describes an invention wherein a "new bra strap retainer [is used] for preventing the straps from falling from the user's shoulder." (Compl. Ex. A, Col. 1.) The device "includes a retaining member having an elongate main portion and opposite end portions which are adapted to keep straps of a bra on a user's back in proximate relationship to one another." (*Id.*, Col. 2.) The '766 patent describes a device that "essentially pulls the [bra] straps on the user's back together" and provides an "easy and convenient [method] to wind the straps

disposed upon the user's back through the bra strap retainer."
(*Id.*, Col. 3)

The '766 patent is a reissue of U.S. Patent
Application 12/575,600, (Spencer Decl. Ex. B, the "'600 Reissue
Application"), which the original patent applicant had filed to
obtain additional claims for U.S. Patent No. 7,278,900 (the
"'900 patent") issued on October 9, 2007.  The original '900
patent was issued from Application 11/087,929. (Spencer Decl.
Ex. A, the "'929 Application.")

Plaintiff alleges that defendant Brazabra's product,
titled the "Bra Converter Clip" (the "accused product"), product
ID: S/44021, is infringing upon the '766 patent in violation of
the United States Patent Laws, 35 U.S.C. § 271, et seq., both
literally and under the doctrine of equivalents.  (Pl. Opp. at
1; Declaration of Theodore Davis in Support of Defendant's
Motion for Summary Judgment ("Davis Decl.") ¶ 3.)

Defendant submitted in its Rule 56.1 Statement of
Undisputed Material Fact, *inter alia*, that plaintiff has accused
the Bra Converter Clip, product ID: S/44021 of infringing the
patent-in-suit, and that the accused product appears as depicted
in the Paragraph 3 of the Davis Declaration, samples of which
were provided to plaintiff's counsel as Exhibit A to the Davis
Declaration.  Plaintiff does not dispute defendant's Rule 56.1
Statement, however plaintiff disputes a number of facts alleged

by defendant in its memorandum of law in support of its motion for summary judgment.  (Pl. Rule 56.1 Stmt. ¶¶ 1-2.)  Thus, the parties do not dispute the physical structure of the patented device or the accused device, or their functionality, and only dispute whether the accused product infringes upon plaintiff's device – either literally or under the doctrine of equivalents. "Where . . . the parties do not dispute any relevant facts regarding the accused product [and] disagree over which of [the] possible meanings of [particular claims at issue] is the proper one, the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." *Dealertrack, Inc. v. Huber,* 674 F.3d 1315, 1320 (Fed. Cir. 2012) (quoting *Athletic Alternatives Inc. v. Prince Mfg., Inc.,* 73 F.3d 1573, 1578 (Fed. Cir. 1996)); *see also Wireless Ink Corp. v. Facebook, Inc.*, 969 F. Supp. 2d 318, 333 (S.D.N.Y. 2013) *aff'd sub nom. Wireless Ink Corp. v. Google, Inc.*, 570 F. App'x 941 (Fed. Cir. 2014).

The court has considered whether the parties have proffered admissible evidence in support of their statements of fact and has viewed the facts in the light most favorable to plaintiff, the non-moving party.  *See Spiegel v. Schulmann,* 604 F.3d 72, 77, 81 (2d Cir. 2010); *Topalian v. Hartford Life Ins. Co.*, 945 F. Supp. 2d 294, 300-01 (E.D.N.Y. 2013).

## I.  Patent Claims at Issue

The claims of a patent are the numbered paragraphs at the end of the patent that define the scope of the invention and thus the scope of the patentee's right to exclude others from making, using, or selling the patented invention.  The terms and phrases within each claim define the scope of each claim.

All patent claims are either independent or dependent. Independent claims stand alone and do not reference any other claim.  Dependent claims, which follow the independent "parent" claims, reference the independent claim and are subsets of the parent claim.  For example, in the patent-in-suit, Claim 2 depends on Claim 1 because it provides: "A bra strap retainer *as described in Claim 1*, wherein said main portion is formed . . ." (Compl. Ex. A, Col. 5.)

The following claims in the patent-in-suit are "independent" and at issue before this court: Claim 1, Claim 6, Claim 8, and Claim 12.[i]  The independent claims contain, *inter alia*, the following key limitations: (1) "an elongate main portion and opposite end portions positioned at opposite ends of said main portion"; (2) a "pair of prongs extending outwardly from opposite sides of said main portion"; (3) a "each of said end portions [of elongate main portion] includes a pair of prongs"; and (4) "each of said prongs having an outer portion

which is essentially disposed parallel to said elongate main

portion." (Compl. Ex. A.)

**DISCUSSION**

## I.   Applicable Legal Standards

### A.   Summary Judgment Standard

The court applies the same summary judgment standards

to patent infringement matters as it does to motions involving

other types of claims. *CA, Inc. v. Simple.com, Inc.*, 780 F.

Supp. 2d 196, 208 (E.D.N.Y. 2009); *Alloc, Inc. v. Norman D.

Lifton Co.*, 653 F. Supp. 2d 469, 473 (S.D.N.Y. 2009); *see Desper

Products, Inc. v. QSound Labs, Inc.*, 157 F.3d 1325, 1332 (Fed.

Cir. 1998)*; Becton Dickinson & Co. v. C.R. Bard. Inc.,* 922 F.2d

792, 795–96 (Fed. Cir. 1990). A court may grant summary

judgment only "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to

any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). In cases

of patent infringement, summary judgment is proper when no

genuine issue of material fact exists and no expert testimony is

required to explain the nature of the patented invention or the

accused product or to assist in their comparison. *Amhil

Enterprises Ltd. v. Wawa, Inc.*, 81 F.3d 1554, 1557–58 (Fed. Cir.

1996).

7

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986) (emphasis in original). "A fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law.'" *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir. 2005); *Holtz v. Rockefeller & Co.,* 258 F.3d 62, 69 (2d Cir. 2001) (*quoting Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jeffreys*, 426 F.3d at 553. Moreover, no genuine issue of material fact exists "unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson,* 477 U.S. at 249–50 (internal citations omitted).

In deciding a motion for summary judgment, the court's function is not to resolve disputed issues of fact, but only to determine whether there is a genuine issue to be tried. *Anderson,* 477 U.S. at 249. The moving party bears the burden of establishing that there is no genuine issue of material fact.

*Id.* at 256.  The movant may discharge this burden by
demonstrating to the court that there is an absence of evidence
to support the non-moving party's case on an issue on which the
non-movant has the burden of proof.  *See Celotex Corp. v.
Catrett,* 477 U.S. 317, 323 (1986).

      "In ruling on a motion for summary judgment, . . . [a
court must] view the evidence presented in a light most
favorable to the nonmoving party and . . . draw all reasonable
inferences in favor of the nonmoving party."  *CA, Inc. v.
Simple.com, Inc.*, 780 F. Supp. 2d 196, 209 (E.D.N.Y. 2009)
(quoting *C.R. Bard, Inc. v. Advanced Cardio. Sys., Inc.,* 911
F.2d 670, 672 (Fed. Cir. 1990)).   The Second Circuit, however,
has explained that "[t]he party against whom summary judgment is
sought . . . 'must do more than simply show that there is some
metaphysical doubt as to the material facts . . . . [T]he
nonmoving party must come forward with specific facts showing
that there is a genuine issue for trial.'"  *Plew v. Limited
Brands, Inc.*, 729 F. Supp. 2d 629 (S.D.N.Y. 2010) *(*quoting
*Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002))
(internal citation omitted); *accord, e.g., Matsushita Elec.
Indus. Co., Ltd. V. Zenith Radio Corp.,* 475 U.S. 574, 587
(1986).  Nor can the nonmoving party rest only on the pleadings.
*Celotex,* 477 U.S. at 324 (stating that Fed. R. Civ. P. 56(e)
"requires the nonmoving party to go beyond the pleadings");

*Davis v. New York,* 316 F.3d 93, 100 (2d Cir. 2002).  Each

statement of material fact by the movant or opponent must be

followed by citation to evidence which would be admissible, as

required by Fed. R. Civ. P. 56(e) and Local Civil Rule 56.1(d).

Indeed, in the infringement context, declarations

offered by the patentee are insufficient to meet the burden of

proof of infringement, as are general assertions of facts,

general denials, and conclusory statements.  *TechSearch, L.L.C.*

*v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002).  Rather,

the "party opposing the motion for summary judgment of

noninfringement must point to an evidentiary conflict created on

the record, at least by a counter-statement of a fact set forth

in detail in an affidavit by a knowledgeable affiant.  Mere

denials or conclusory statements are insufficient."  *TechSearch*,

286 F.3d at 1372 (citing *Collins, Inc. v. N. Telecom, Ltd.,* 216

F.3d 1042, 1046 (Fed. Cir. 2000))

"Summary judgment is as appropriate in patent cases as

in other cases when the requirements of Rule 56 of the Federal

Rules of Civil Procedure have been met."  *Meyers v. Asics Corp.,*

865 F. Supp. 177, 179 (S.D.N.Y. 1994) (citation omitted), *aff'd,*

78 F.3d 605 (Fed. Cir. 1996); *see Amhil Enterprises Ltd. v.*

*Wawa, Inc*., 81 F.3d 1554, 1557-58 (Fed. Cir. 1996) ("Summary

judgment may, however, properly be decided as a matter of law

when no genuine issue of material fact exists and no expert

testimony is required to explain the nature of the patented invention or the accused product or to assist in their comparison."). "[I]nfringement is itself a fact issue," *SRI Int. v. Matsushita Elec. Corp. of America,* 775 F.2d 1107, 1116 (Fed. Cir. 1985), therefore courts have repeatedly emphasized that patent claims "are ones in which issues of fact often dominate the scene and summary judgment is allowed only with great caution." *Acrison, Inc. v. Schenck Corp.*, 973 F. Supp. 124, 126 (E.D.N.Y. 1997) (quoting *Garter-Bare Co. v. Munsingwear, Inc.,* 650 F.2d 975, 982 (9th Cir. 1980)); *see also Gaus v. Conair Corp.*, No. 94-CV-5693, 1998 WL 92430, at *2 (S.D.N.Y. Mar. 3, 1998) (citations omitted). Thus, summary judgment on the issue of infringement is proper only when "no reasonable jury could find that every limitation recited in a properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *Spiel Associates, Inc. v. Gateway Bookbinding Sys., Ltd.*, No. 03-CV-4696, 2010 WL 546746, at *6 (E.D.N.Y. Feb. 16, 2010) (citing *PC Connector Solutions LLC v. SmartDisk Corp.,* 406 F.3d 1359, 1364 (Fed. Cir. 2005)) (internal citation omitted).

When deciding issues in a patent case, a district court applies the law of the circuit in which it sits to nonpatent issues and the law of the Federal Circuit to issues of

substantive patent law. *Revlon Consumer Products Corp. v. Estee Lauder Companies, Inc.*, No. 00-CV-5960, 2003 WL 21751833, at *7 (S.D.N.Y. July 30, 2003) (citing *In re Cambridge Biotech Corp.,* 186 F.3d 1356, 1368 (Fed. Cir. 1999)); *see also Amana Refrigeration, Inc. v. Quadlux, Inc.,* 172 F.3d 852, 856 (Fed. Cir. 1999).  The court will also apply the law of the Federal Circuit to procedural issues that are "intimately involved in the substance of enforcement of the patent right." *Advanced Cardiovascular Sys., Inc. v. Medtronic, Inc.,* 265 F.3d 1294, 1303 (Fed. Cir. 2001) (the Federal Circuit "appl[ies] the law of the regional circuit to which the district court appeal normally lies unless 'the issue pertains to or is unique to patent law,' in which case [the Federal Circuit] will apply [its] own law to both substantive and procedural issues 'intimately involved in the substance of enforcement of the patent right.'"); *Revlon Consumer Products*, 2003 WL 21751833, at *7.

**B.   Two Step Analysis: Claim Construction Then Determination of Infringement**

"A two-step process is used in the analysis of patent infringement: first, the scope of the claims are determined as a matter of law, and second, the properly construed claims are compared to the allegedly infringing device to determine, as a matter of fact, whether all of the limitations of at least one claim are present, either literally or by a substantial

equivalent, in the accused device." *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1323 (Fed. Cir. 2002); *Revlon Consumer Products*, 2003 WL 21751833, at *8.

## II. Claim Construction

### A. Applicable Law Regarding Claim Construction

The district court's power to enter summary judgment does not allow it to bypass performing a complete patent infringement analysis. *Grober v. Mako Products, Inc.*, 686 F.3d 1335, 1344 (Fed. Cir. 2012). "[T]he construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Markman v. Westview Instrs., Inc.,* 517 U.S. 370, 372 (1996). Indeed, claim construction is a question of law, *Cybor Corp.,* 138 F.3d at 1454, and "is the judicial statement of what is and is not covered by the technical terms and other words of the claims." *Netword, LLC v. Centraal Corp.,* 242 F.3d 1347, 1352 (Fed. Cir. 2001); *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 386 F. Supp. 2d 526, 532 (S.D.N.Y. 2005). Thus, before reaching any determination on infringement, the court must construe the patent's claim limitations to define the invention which a patentee has a right to exclude others from practicing, in the absence of the patentee's permission or authorization. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115–16 (Fed. Cir. 2004).

Courts are permitted on summary judgment to construe the claims of the patent at issue to determine their meaning and scope, followed by a determination of whether evidence offered raises a triable issue of fact with regard to infringement. *See TecSec, Inc. v. Int'l Bus. Machines Corp.*, 731 F.3d 1336, 1352 (Fed. Cir. 2013) *cert. denied sub nom. Cisco Sys., Inc. v. TecSec, Inc.*, 134 S. Ct. 2698 (2014) (finding that district court's summary judgment opinion followed proper infringement analysis by first construing patent claims and second determining whether the evidence offered by defendant, which compared the claims to the accused products, raised a triable issue of material fact).

A court construing a patent claim seeks to accord a claim the meaning it would have to a "person of ordinary skill in the art at the time of the invention*." Innova/Pure Water,* 381 F.3d at 1116. Indeed, claim terms are entitled to a "heavy presumption" that they carry their "ordinary and customary meaning." *Elbex Video, Ltd. v. Axis Commc'ns, Inc.*, No. 05-CV-3345, 2008 WL 5779782, at *11 (E.D.N.Y. Aug. 19, 2008) (citing *Teleflex,* 299 F.3d at 1325) (internal citation omitted). The claims themselves, the specification and the prosecution history may be used to determine the ordinary meaning of a term, but "in any event the ordinary meaning must be determined from the standpoint of a person of ordinary skill in the relevant art."

*Id.* Thus, the court must determine the meaning of the words in the patent so that the public can be properly placed on notice as to what inventions are and are not covered. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.,* 182 F.3d 1298, 1311 (Fed. Cir. 1999) (discussing the importance of public notice function in claim construction).

"It is well-settled that, in interpreting an asserted claim, the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification and, if in evidence, the prosecution history. Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed. Cir. 1996) (citation omitted); *see Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005); *Rackman v. Microsoft Corp.*, 102 F. Supp. 2d 113, 117 (E.D.N.Y. 2000) (citing *Georgia-Pacific Corp. v. U.S. Gypsum Co.,* 195 F.3d 1322, 1332 (Fed. Cir. 1999)).

First, the court looks to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention. *Vitronics*, 90 F.3d at 1582. The words of the claim itself are the single most important source of the meaning of the claim. *See Eastman Kodak Co. v. Goodyear Tire & Rubber Co.,* 114 F.3d 1547, 1552 (Fed. Cir. 1997), *abrogated on other grounds by Cybor Corp. v. FAS Technologies,*

*Inc.,* 138 F.3d 1448 (Fed. Cir. 1998) (en banc).  The claim
language is given its ordinary and customary meaning unless a
special definition is employed in the specification or
prosecution history.  *See Vitronics,* 90 F.3d at 1582; *see also*
*Digital Biometrics, Inc. v. Identix, Inc.,* 149 F.3d 1335, 1344
(Fed. Cir. 1998) ("Without an express intent to impart a novel
meaning to claim terms, an inventor's claim terms take on their
ordinary meaning.") (quoting *York Prods., Inc. v. Central*
*Tractor Farm & Family Ctr.,* 99 F.3d 1568, 1572 (Fed. Cir.
1996)).  The ordinary and customary meaning of a claim term is
the meaning that "one of skill in the art at the time of the
invention would understand [ ]."  *Eastman Kodak,* 114 F.3d at
1555 (citing *Intellicall,* 952 F.2d at 1387); *accord Markman v.*
*Westview Instruments, Inc.,* 52 F.3d 967, 986 (Fed. Cir. 1995),
*aff'd,* 517 U.S. 370 (1996).  "If the claim language is clear on
its face, then [the court's] consideration of the rest of the
intrinsic evidence is restricted to determining if a deviation
from the clear language of the claims is specified."
*Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323,
1331 (Fed. Cir. 2001); *see Revlon Consumer Products*, 2003 WL
21751833, at *9.

    Next, the court looks to the specification, as
"[c]laims must be read in view of the specification, of which
they are a part."  *Markman,* 52 F.3d at 979.  Therefore, a court

must review the specification to determine whether the inventor used any terms in a manner inconsistent with their ordinary meaning.  The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication.  *Vitronics*, 90 F.3d at 1582 (citing *Markman,* 52 F.3d at 979).  Although patent applicants have the flexibility to define claim terms in a manner inconsistent with their ordinary meaning, the special definition of the term must be set out in the specification or file history in a manner sufficient to give one of ordinary skill in the art notice of the change from the ordinary meaning.  *Innova/Pure Water*, 381 F.3d at 1117.

Third, the court may consider the prosecution history of the patent, if it is in evidence.  *Phillips*, 415 F.3d at 1317 (citing *Markman*, 52 F.3d at 980); *Amhil Enterprises*, 81 F.3d t 1559 ("The prosecution history, in addition to being used while considering the factual issue of infringement and whether prosecution history estoppel places any limitations on what infringes a claim, should also be used when considering the legal issue of proper claim construction.").  The prosecution history contains a complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims.  As such, the record before the Patent and Trademark

Office is often of critical significance in determining the meaning of the claims. *See Markman,* 52 F.3d at 980; *Southwall Tech., Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution.") (citations omitted).

Finally, although in most situations, an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term, a court may consider extrinsic evidence if necessary. *Vitronics*, 90 F.3d at 1583. "Extrinsic evidence is that evidence which is external to the patent and file history, such as expert testimony, inventor testimony, dictionaries, and technical treatises and articles." *Vitronics*, 90 F.2d at 1584. Extrinsic evidence, however, is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Secure Web Conference Corp. v. Microsoft Corp.*, No. 13-CV-2642, 2014 WL 4954644, at *2 (E.D.N.Y. Oct. 2, 2014) (citing *Phillips,* 415 F.3d at 1317). The Federal Circuit condones the use of dictionaries "to assist in understanding the commonly understood meaning of words," *Phillips,* 415 F.3d at 1317, and has held that "[c]ourts may rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents." *3M*

*Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1321
(Fed. Cir. 2013) (citing *Advanced Fiber Tech. (AFT) Trust v. J &
L Fiber Servs., Inc.,* 674 F.3d 1365, 1374-75 (Fed. Cir. 2012)).

The Federal Circuit, however, cautions courts not to
place "too much reliance on extrinsic sources such as
dictionaries . . . and too little on intrinsic sources, in
particular the specification and prosecution history.".
*Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005)
(citing *Texas Digital,* 308 F.3d at 1204).  The Federal Circuit
clarified that the principles outlined in *Texas Digital Systems,
Inc. v. Telegenix,* 308 F.3d 1193 (Fed. Cir. 2002)*,* which had
encouraged the use of extrinsic sources such as dictionaries,
should no longer guide a district court's consideration of
dictionary definitions.  As the Federal Circuit explained in
*Phillips*:

> The main problem with elevating the
> dictionary to such prominence is that it
> focuses the inquiry on the abstract meaning
> of words rather than on the meaning of claim
> terms within the context of the patent ....
> [I]f the district court starts with the
> broad dictionary definition in every case
> and fails to fully appreciate how the
> specification implicitly limits that
> definition, the error will systematically
> cause the construction of the claim to be
> unduly expansive.

*Phillips,* 415 F.3d at 1321.  Accordingly, the Federal Circuit
directs district courts "focus[ ] at the outset on how the

patentee used the claim term in the claims, specification, and prosecution history" instead of "starting with a broad definition and whittling it down," *Id.*

"A word or phrase used consistently throughout a claim should be interpreted consistently." *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,* 279 F.3d 1022, 1031 (Fed. Cir. 2002) (citing *Phonometrics, Inc. v. Northern Telecom Inc.,* 133 F.3d 1459, 1465 (Fed. Cir. 1998). On the other hand, where a claim term is used "in two contexts with a subtle but significant difference" the term "should not necessarily be interpreted to have the same meaning in both phrases." *Epcon Gas Systems,* 279 F.3d at 1031.

Moreover, although claims are to be construed in light of the specification, courts must be careful not to read limitations from the specification into the claim. *Phillips,* 415 F.3d at 1323. For example, if a patent specification describes only a single embodiment, the claims of the patent should not be construed as limited to that embodiment in all circumstances. *Id.* Rather, it is to be understood that the purpose of the specification "[is] to teach and enable those of skill in the art to make and use the invention" and that sometimes, the best way to do that is to provide an example. *Id.* Similarly, the Federal Circuit has cautioned that "patent coverage is not necessarily limited to inventions that look like

the ones in the figures," noting that taking such an approach to claim construction would amount to "import[ing] limitations onto the claim from the specification, which is fraught with danger." *MBO Laboratories, Inc. v. Becton, Dickinson & Co.,* 474 F.3d 1323, 1333 (Fed. Cir. 2007).

**B.    Application**

The court need only construe the disputed claim language "to the extent necessary to resolve the controversy." *Vivid Techs., Inc. v. Am. Science & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999); *see also Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358 (Fed. Cir. 2001) ("If the district court considers one issue to be dispositive, the court may cut to the heart of the matter and need not exhaustively discuss all other issues presented by the parties."); *Biovail Corp. Int'l v. Andrx Pharms., Inc.*, 239 F.3d 1297, 1301 (Fed. Cir. 2001) (finding it unnecessary to construe claim term that was not relevant to outcome of the case). Accordingly, the court will construe only those claims that are in dispute between the parties: (1) "prongs"; (2) "elongated main member"; (3) "each of said end portions [of elongate main portion] including prongs"; and (4) "essentially disposed parallel."

Here, a "*Markman* hearing," or claim construction hearing, to interpret the claim language is not necessary because the disputed claim terms are neither ambiguous nor

highly technical. *Revlon Consumer Products*, 2003 WL 21751833, at *14 (finding no need for a *Markman* hearing when sole disputed claim term, "completely coated," was neither ambiguous nor technical); *LRC Elec., Inc. v. John Mezzalingua Assocs., Inc.,* 974 F. Supp. 171, 181–82 (N.D.N.Y. 1997) ("A *Markman* hearing to define the [disputed claim] term . . . would only be necessary if the Court needed expert testimony to interpret the term . . . . After carefully considering the language used in claim one, the specification, and Webster's Dictionary, the Court finds that the meaning of the [claim] term . . . is the one stated in Webster's Dictionary . . . and hence no *Markman* hearing[ ] is needed in the instant case . . . ."). As such, the court may and will interpret and construe the disputed claims in its summary judgment decision. The court addresses each of the disputed terms in turn. For ease of reference, depicted below as Figure 1 of this Memorandum and Order, is the image provided as Figure 4 of the '766 patent. (Compl. Ex. A, Fig. 4.) Depicted as Figure 2 is a labelled diagram of defendant's accused product. (Davis Decl. ¶ 3.)



Figure 1: The '766 Patent
(Compl. Ex. A, Fig. 4.)



Figure 2: Accused Product
(Davis Decl. ¶ 3.)

i. Prongs

The '766 patent specifies "a pair of prongs, each prong of a said pair of prongs extending outwardly from opposite sides." (Compl. Ex. A, Col. 5.) The "prongs" are represented by 14A, 15A, 16A and 17A in figure 1. Defendant proposes that the term "prong" as used in the '766 patent means a "slender pointed or projecting part" like a "tine on a fork," and does not describe defendant's accused product which is comprised of a circle or segments forming a circle. (Def. Mem. at 10; Oral Argument Transcript ("Tr.") 5.) Defendant further argues that the court must look to the definition in the context of the patent - not extrinsic evidence - and contends that in the description and illustration of the patent, the term "prong" is used in a manner consistent with the meaning "short pointed part like a tine on a fork" that has "ends." (Def. Mem. at 10; ECF

No. 16, Defendant's Reply Memorandum in Support of Summary
Judgment ("Def. Reply") at 3; Tr. 5.)

Plaintiff contends that claim construction requires
that terms be given "the full range of their ordinary meaning as
understood by persons skilled in the relevant art." (Pl. Opp.
at 5.) Plaintiff also argues that defendant improperly combines
two independent definitions – "slender pointed or projecting
part" and "a tine on a fork" – to define the term "prong."
Plaintiff in turn proposes that prongs are defined as "slender
projecting parts" that need not be pointed, and may encompass
portions of circle as present in the accused product's design.
(Pl. Opp. at 6; Tr. 18.) Moreover, plaintiff contends that,
although "a prong as we normally look at it has an end, . . . .
[p]rongs don't have to have an end." (Tr. 18.) As an example,
plaintiff cited to prongs of a river that do not end. (*Id.*)

First, the court gives the term "prong" its ordinary
and customary meaning, because a special definition is not used
in the specification or prosecution history. *See Grober v. Mako
Products, Inc.*, 686 F.3d 1335, 1341 (Fed. Cir. 2012) (citing
*Phillips,* 415 F.3d at 1312–1313; *Vitronics,* 90 F.3d at 1582. To
determine the "ordinary and customary meaning" of a claim term,
a court must first consult the patent's intrinsic evidence,
specifically the claims, the specification, and the prosecution
history. *See, e.g., Primos, Inc. v. Hunter's Specialties, Inc.,*

451 F.3d 841, 847-48 (Fed. Cir. 2006); *Kinik Co. v. Int'l Trade Comm'n,* 362 F.3d 1359, 1365 (Fed. Cir. 2004); *Small v. Nobel Biocare USA, LLC*, No. 05-CV-3225, 2011 WL 3586470, at *4 (S.D.N.Y. Aug. 11, 2011) *on reconsideration in part,* No. 05-CV-3225, 2012 WL 952396 (S.D.N.Y. Mar. 21, 2012).

The court first turns to the specification, including all of the claims, as "[c]laims must be read in view of the specification, of which they are a part." *Markman,* 52 F.3d at 979. Here, the '766 patent specification does not explicitly define "prong," and describes the prongs as "extending outwardly from opposite sides of said main portion in substantially opposite directions" and as "curved and directed toward one of said prongs on the other said end portion." (Compl. Ex. A, Col. 5.) The specification also indicates that each prong "extends inwardly toward another one said prong of a second said pair of prongs." (*Id.*) The patentee further describes the prongs in Claim 6 as "being essentially C-shaped, and the other said end portions being essentially an inverted C-shape." (*Id.*) Thus, the entire specification leaves the reader with the impression that the prongs extend away from the center piece towards the opposite end.

The specification, however, does not include any language indicating that the prongs on opposite ends constitute portions of the same semi-circle or that the prongs extend

*continuously* to connect with the prongs on the other end
portion. "If an apparatus claim recites a general structure
(e.g., a noun) without limiting that structure to a specific
subset of structures (e.g., with an adjective), the Federal
Circuit generally construes the claim to cover all known types
of that structure that are supported by the patent disclosure."
*Aspex Eyewear*, 386 F. Supp. 2d at 537 (citing *Renishaw PLC v.*
*Marposs Societa' per Azioni,* 158 F.3d 1243, 1250 (Fed. Cir.
1998)). Indeed, the patentee need not "describe in the
specification every conceivable and possible future embodiment
of his invention." *Id.* (citing *CCS Fitness v. Brunswick Corp.,*
288 F.3d 1359, 1366 (Fed. Cir. 2002) (internal citations
omitted)).

Although the specification does not explicitly limit
the "prongs" to structures that include a tip or endpoint, the
description of each pair of prongs as "C-shaped" or an "inverted
C-shape" suggests that the prongs have endpoints and do not
meet; otherwise, the patentee would have further indicated that
the prongs may altogether form an oval or circular shape. Thus,
although the language does not preclude the possibility that the
prongs extend continuously toward each other until they meet,
the fact that this possibility exists does not put the public on
notice that a continuous extension was within the patentee's
intended specifications. Thus, the term "prong" as used in the

specification suggests a "slender pointed or projecting part" with an outward extension with an end point or tip.

Next, the court reviews the '766 patent's prosecution history to ascertain the true meaning or effect in the use of the word "prong." The use of the word prongs is consistent throughout the prosecution history of the '766 patent, and is consistent with the ordinary use of the word as a "slender pointed or projective part." Indeed, in the initial patent application filed, Patent No. 7,278,900, the patentee described each of the "end portions" as containing "prongs" which extended inward toward the prongs at the opposite ends of the structure. (Spencer Decl. Ex. B, at 3.) These "end portions" are again described as "substantially C-shaped" and "substantially an inverted C-shape." (*Id.* at 4.)

Although plaintiff invites the court to construct a broader meaning of the term "prong," – indeed suggesting that "prongs of a river do not end" (Tr. 18) – the court finds that there is no indication from the intrinsic evidence that the prongs as described in the '766 patent have a meaning broader than the ordinary meaning, or that the prongs may continuously extend toward one another to meet or fuse together, forming a half circle. Accordingly, the court respectfully declines to apply a meaning to the term "prongs" that is broader than specification requires.

Finally, the court may look to extrinsic evidence, if necessary, for additional clarity with regard to the proper construction of "prong." Because "prong" is neither an ambiguous nor complex term, additional reference to extrinsic evidence is not necessary. After consideration of the ordinary language and the usage of the phrase in the specification and prosecution history, the court construes "prong" as a slender outward projecting part with a tip or endpoint.

ii. Elongate Main Portion

The '766 specification requires a "retaining member having an elongate main portion," used interchangeably with "a bra strap retainer comprising at least a pair of strap-retaining members positioned at opposite ends of the retainer, respectively, and an elongated member extending between the strap-retaining members." (Compl. Ex. A.) The elongate main portion is depicted as 30 in Figure 1. Defendant proposes that the phrase "elongate main portion" as used in the '766 patent requires "one contiguous main portion." (Def. Mem. at 11.) Defendant argues that the accused product is missing an "elongate main portion" because the center portion is split. (*Id.*)

Plaintiff defines "elongate main portion" as something that has a length which is greater than its width. (Tr. 12.) Plaintiff argues that the '766 patent does not define "elongate

main portion" or "elongated member" as being a single piece, but only indicates that there must be a main central portion of the invention that is elongated. (Pl. Opp. at 8.) Indeed, plaintiff contends that the patent's "claim language does not preclude the splitting of the elongate main portion." (*Id.*) Defendant argues in its Reply that plaintiff is attempting to use a definition for "elongate main portion" that is divorced from the context of the specification and instead contends that the fact that a split main portion is possible does not provide "explicit or implicit notice to the public." (Def. Reply at 4.)

First, the ordinary and customary meaning of "elongate main portion" suggests a single main, or central, structure that is longer in its length than in its width, and that is main, or principal or central, to the product in relation to the other parts. Indeed, a structure that is identical in length and height would be a square. Thus, any "elongate structure" would be longer in length than the other. "Main portion" suggests a structure that is central to the apparatus.

In reading the claim term "elongate main portion" in view of the specification, there is no indication that the term "elongate main portion" has a meaning different than the ordinary meanings. Moreover, the specification uses the terms "elongate main portion" and "elongated member" interchangeably, and the usage of the term in the specification indicates that

the "elongated member" extends substantially across the apparatus and constitutes a "main" or central structure in the overall apparatus.  Thus, the term "elongated member" also refers to the "main portion," despite omission of the term "main."  Claim 15 describes the "elongated member" as "extending *between* the strap retaining members," where such strap retaining members are "positioned at opposite ends of the retainer." (Compl. Ex. A, Col. 6.)  The specification further states that an "elongated member *extends across the bra strap retainer* from opposite ends of the bra strap retainer" indicating that the elongate piece extends across the entirety of the apparatus and represents a majority portion of the overall specification. (*Id.*)  Moreover, the description suggests that this elongated member spans across from one end of the apparatus to the opposite end without a substantial split or break in the middle or at any point.  Although plaintiff's contention that the patent does not explicitly preclude "elongate main portions" from being split in the center is correct, the language of the specification suggests that the main elongate structure is contiguous and does not otherwise put the public on notice that the structure could be split or otherwise broken apart in a substantial way.

Next, the court will consider the prosecution history of the patent.  During prosecution and the reissue of the '766

patent, the patentee added Claims 12 to 15, which refer to the
"elongate main portion" as a "elongated member" and require that
the "elongated member extend[] across the bra strap retainer
from opposite ends of the bra strap retainer." (Spencer Decl.
Ex. B, '600 Application Amendment at 6.)  The patentee added
Claims 12 to 15 to address the Patent Office's finding that "a
weave member" was not disclosed in the prior specification; thus
the patentee amended the application to use the term "elongated
member."  Nothing in the patent's prosecution history indicates
that the term "elongated main portion" or "elongated member" has
a meaning that diverges from the ordinary meaning of the words.

Finally, there is no ambiguity or complexity in the
phrase "elongated main portion" or "elongated member" that
requires consideration of extrinsic evidence.  After
consideration of the ordinary language and the usage of the
phrase in the specification and prosecution history, the court
construes "elongate main portion" or "elongated member" as a
main structure that is longer than it is wide, and that extends
continuously across the opposite ends of the apparatus without a
substantial break or gap.

iii. <u>Each of said end portions [of elongate main
portion] including prongs</u>

The specification requires that "each of said end
portions [of the elongate main portion] includes a pair of

prongs." The end portions are depicted as 32 and 33 in Figure 1. Defendant argues that, assuming that the elongate main portion could be split, each of the elongate main portions' end portions located in the center of the accused product at the "split" does not include a pair of prongs. (Def. Mem. at 13.) Thus, under defendant's construction of the claim, the "end portions" of the elongate main portion reside at the center of the accused product, at A1/A2 and A3/A4 of Figure 2.

The ordinary and customary meaning of this phrase indicates that each "end portion" of the main structure requires prongs. Should the court accept that the center piece is the "elongate main portion," though split, the dispute is whether the inner edges in the accused product constitute "end portions" that would require prongs or whether the "end portions" reside at the outermost edges of the structure. The specification is clear in the requirement that each "end portion" contain a pair of prongs.

The ordinary meaning of "end" is "a point that marks the limit of something," "the point at which something no longer continues to happen or exist," or "the part at the edge or limit of an area." *Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1303 (Fed. Cir. 2012) (noting district court's construction of "end points" as "the outer edge of the end panels of the case"); *Research Plastics, Inc. v. Fed.*

*Packaging Corp.*, 421 F.3d 1290, 1296 (Fed. Cir. 2005) (defining the claim term "rear end" as referring to the "outermost edge of the tube" including the inside and outside edges); *see also End*, Merriam-Webster Dictionary, http://www.merriam-webster.com/dictionary/end. Thus, the ordinary meaning of end portion suggests that it means the outer most edge or limiting point of a structure.

In view of the specification and the prosecution history, the use of the word "end portions" does not deviate from its ordinary meaning. The specification describes the "end portions" as "opposite end portions positioned at opposite ends of said main portion" and suggests that these end portions reside at the outermost limits of the apparatus. Moreover, the specification and prosecution history assume a single main portion – whether split or not – and thus assumes that there are only two ends on the outer most limits of the horizontal plane.

Because the phrase "each of said end portions [of elongate main portion] including prongs is neither ambiguous nor complex, additional reference to extrinsic evidence is not necessary. Thus, after consideration of the ordinary language and the usage of the phrase in the specification and prosecution history, the court construes "each of said end portion" as the outer most edges or limiting points of a structure.

iv.  Essentially Disposed Parallel

The specification requires that "each of said prongs ha[s] an outer portion which is essentially disposed parallel to said elongate main portion."  (Compl. Ex. A.)  Defendant argues that plaintiff improperly cites to an imaginary tangent line in the accused product as parallel to the main portion but "parallel" is defined as "extend[ing] in the same direction and everywhere equidistant."  Thus, no singular point of a curved surface can be considered parallel.  Defendant also argues that plaintiff improperly construes "essentially disposed parallel" to read on an imaginary tangent line to a circle, rendering the term "parallel" meaningless, and that plaintiff attempts to divorce the claim terms from the context of the specification.

Plaintiff argues that defendant improperly limits the definition of "essentially disposed parallel" and disregards the modifier "essentially" to conclude that the claim term requires the relevant portions to be "completely parallel."  (Pl. Opp. At 7.)  Plaintiff contends that the addition of the word "essentially" indicates that the prongs need not be fully parallel, and that "essentially" would otherwise have no operative meaning in the patent/claim.  (Pl. Opp. at 7.)

The court agrees that a claim construction should give meaning to all the terms in a claim.  Indeed, claims must be "interpreted with an eye toward giving effect to all terms in

the claim." *Bicon, Inc. v. Straumann Co.,* 441 F.3d 945, 950 (Fed. Cir. 2006); *see Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so."); *TouchTunes Music Corp. v. Rowe Int'l Corp.*, 727 F. Supp. 2d 226, 233 (S.D.N.Y. 2010) (citing *Stumbo v. Eastman Outdoors, Inc.,* 508 F.3d 1358, 1362 (Fed. Cir. 2007)) ("A claim construction that renders claim language superfluous is almost always incorrect."). However, giving the ordinary meaning to "essentially disposed parallel" suggests that the prongs, although they need not be fully parallel, must fundamentally and basically tend toward or incline toward parallel, at least more so than not. The combination of "essentially" and "parallel" creates an interesting conundrum for the court, because fixtures that are not completely parallel are not parallel at all. The ordinary meaning of parallel is "extending in the same direction, everywhere equidistant, and not meeting" or "everywhere equally distant." Parallel is a mathematical concept and characterization that cannot be qualified; something either is or is not parallel. Words of approximation, however, such as "substantially," "generally," or "essentially," as it is used here, are commonly used in patent claims to avoid strict numerical boundary to specific parameters. *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls,*

*Inc.*, 340 F.3d 1298, 1310-11 (Fed. Cir. 2003). Thus, it would be improper to interpret the phrase "essentially disposed parallel" to be limited to the ordinary meaning of "disposed parallel." Accordingly, the court constructs the phrase "essentially disposed parallel" to mean something close to being parallel, but with some deviation.

The prosecution history reveals that the Patent Office's rejected the patentee's application as being anticipated by prior art of Wyeth. (Spencer Decl. Ex. A, '929 Amendment, dated February 7, 2007 at 3, 7.) The Patent Office had found that the Wyeth patent, U.S. Patent No. 1,401,227, anticipated the patent-in-suit by having an "elongate main portion 4 and opposite end portions at opposite ends thereof with each end portion including a pair of prongs." (Spencer Decl. Exs. A, Rejection at 2.) In response, the patentee added language that "each of said prongs has an outer portion which is essentially disposed parallel to said elongate main portion, said prongs and said elongate main portion being adapted to retain the straps of the bra therebetween with the straps being wound through said slots between said prongs and said elongate main portion." (*Id*. at 3.) Thus, the prosecution history suggests that the specification requires prongs with an outer portion that is at least more parallel than the prongs depicted in the Wyeth patent.

There is no remaining ambiguity or complexity in the phrase "essentially disposed parallel" that requires consideration of extrinsic evidence. Thus, after consideration of the ordinary language and the usage of the phrase in the specification and prosecution history, the court construes "essentially disposed parallel" to define structures that are substantially or nearly parallel, but contain some amount of deviation.

## III. Summary Judgment on Literal Infringement

### A. The Parties' Arguments

Defendant argues that no literal infringement exists because the accused patent is missing the following limitations from the patent's independent claims 1, 6, 8 and 12: (1) prongs; (2) an elongate main portion; (3) end portions [of the elongate main portion] including prongs; and (4) prongs that are "essentially disposed parallel" to the main elongate portion. (Def. Mem. at 9.)

### B. Legal Standard for Literal Infringement

A patent is infringed if a single claim is infringed. *See Grober*, 686 F.3d at 1344; *Intervet America, Inc. v. Kee-Vet Labs., Inc.,* 887 F.2d 1050, 1055 (Fed. Cir. 1989). "Literal infringement requires that each and every claim limitation [within each of the patent's claims] be present in the accused product." *Spiel Associates*, 2010 WL 546746, at *7 (citing

*Abraxis Bioscience v. Mayne Pharma (USA) Inc.,* 467 F.3d 1370,

1378 (Fed. Cir. 2006)). If even "one [claim] limitation is

missing or not met as claimed," there can be no literal

infringement. *Mas-Hamilton Group v. LaGard, Inc.,* 156 F.3d

1206, 1211 (Fed. Cir. 1998).

In determining whether an accused product is

infringing on the patent-at-issue, first, as discussed *supra,*

"the court determines the scope and meaning of the patent claims

asserted," and second, the court compares the claims "to the

allegedly infringing devices." *Grober*, 686 F.3d at 1344 (citing

*Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1451 (Fed. Cir.

1998)); *Vitronics*, 90 F.3d at 1581-82 (citing *Markman,* 52 F.3d

at 976) ("A literal patent infringement analysis involves two

steps: (1) the proper construction of the asserted claim and (2)

a determination as to whether the accused method or product

infringes the asserted claim as properly construed.").

C. **Application**

"One who does not infringe an independent claim cannot infringe

a dependent claim on (and thus containing all the limitations

of) that claim." *Becton Dickinson and Co. v. C.R. Bard, Inc.,*

922 F.2d 792, 798 (Fed. Cir. 1990) (*quoting Wahpeton Canvas Co.

v. Frontier, Inc.,* 870 F.2d 1546, 1553 (Fed. Cir. 1989));

*Carotek, Inc. v. Kobayashi Ventures, LLC*, 875 F. Supp. 2d 313

n.21, 338 (S.D.N.Y. 2012) (quoting *Muniauction, Inc. v. Thomson*

*Corp.,* 532 F.3d 1318, 1328–29 n.5 (Fed. Cir. 2008)) (noting that "[a] conclusion of noninfringement as to the independent claims requires a conclusion of noninfringement as to the dependent claims."). Because the holding of non-infringement of an independent claim applies to all claims dependent on that claim, the court's decision will only address the independent claims and their pertinent claim limitations set forth in the '776 patent. *ABC Indus., Inc. v. Kason Indus., Inc.*, 30 F. Supp. 2d 331, 339 n.5 (E.D.N.Y. 1998) *aff'd,* 217 F.3d 859 (Fed. Cir. 1999); *see Wolverine World Wide, Inc. v. Nike, Inc.,* 38 F.3d 1192, 1199 (Fed. Cir. 1994). As noted above, and discussed *supra*, the following claims in the patent-in-suit are "independent": Claim 1, Claim 6, Claim 8, and Claim 12. For ease of reference, a diagram of defendant's accused product is labelled in Figure 1.



Figure 2: Accused Product (Davis Decl. ¶ 3.)

### i. Claims 1, 6, and 8

Claims 1, 6, and 8 of the patent-in-suit each require a "pair of prongs" positioned at the product's "end portions." (Compl. Ex. A, Cols. 5-6.) Each claim also describes the "prongs" as "extending outwardly from opposite sides of said main portion in substantially opposite directions." (*Id.*) Moreover, Claims 6 and 8 describe the prongs as "being curved and directed toward one of said prongs on the other said end portion" and "being essentially C-shaped" or "essentially an inverted C-shape." (*Id.*)

Defendant argues that the accused product lacks a "pair of prongs" and is missing "each of said end portions [of elongate main portion] includ[ing] a pair of prongs." (Def.

40

Mem. at 12-13.)  Plaintiff, however, contends that the "pair of
prongs" in the accused product consist of the circle segments
located at points C, D, E and F in Figure 1.  (Pl. Opp. at 7.)
Plaintiff further argues that, in any event, it is a question
for the jury whether "segments of a circle" can be considered
within the scope of the court's constructed claim term, which
plaintiff asserts should be defined as a "slender projecting
part."  (*Id*.)  Defendant responds by arguing that the dispute
regarding the scope of a prong is a legal one and that
"Plaintiff's legal position relies on the overruled law of *Texas
Digital*, divorcing a term from the specification.  As such,
Plaintiff fails to 'identify genuine issues that preclude
summary judgment.'"  (Def. Reply at 4.)

        As discussed in the Claim Construction, the phrase
"pair of prongs" describes a pair of slender projecting parts
with tips or endpoints that do not meet.  Thus, applying this
definition, as discussed in the court's Claim Construction,
defendant's accused product does not fall within the scope of
the '766 patent's claims and therefore does not literally
infringe upon Claims 1, 6, and 8.

        Although the analysis may stop here, even assuming,
*arguendo*, that the circle segments depicted at points C, D, E
and F in Figure 2 constitute "prongs," and further asserting
that the split middle section constitute the "elongate main

portion" of the accused product, the court finds that the "prongs" are not "essentially disposed parallel" to the "elongate main portion," as required in Claims 1, 6, and 8.

Indeed, defendant argues that the accused product is missing prongs with an outer portion "essentially disposed parallel" to the elongate main portion and that plaintiff improperly "cites to an imaginary tangent line as parallel to the main portion," which is not disclosed in the patent's specification. (Def. Mem. at 13-14.) Plaintiff responds with the argument that the term "essentially parallel" is "used to describe the curved portions of the prongs of the '766 patent." (Pl. Opp. at 8.) Plaintiff also contends that defendant misconstrues "essentially parallel" as being fully parallel, however, the addition of the word "essentially" indicates that the specification "does not require a complete parallel arrangement between the 'prongs' and 'elongate main portion'; otherwise "essentially" would have no operative meaning in the patent/claim. (Pl. Opp. at 7-8.)

In response, defendant argues that the specification requires that the "outer portion" of the prongs must be "essentially parallel" to the main elongate portion, and plaintiff impermissibly substitutes an undisclosed, imaginary tangent line touching a point on a curved portion to read the

accused product onto the specification's claims.  (Def. Reply at 6.)

Accepting plaintiff's tangent theory, there are only *two* points on the rounded ends – one at the top and one at the bottom, located at points H1 and H2 in Figure 1 – from which one can draw an imaginary tangent line that is parallel with the center main portion.  Applying plaintiff's argument, there are four "prongs."  Thus, a second tangent line would necessarily have to be drawn to account for the other two prongs.  Although the term "essentially disposed" permits some deviation from the requirement of being parallel – and thus, other tangent lines may be drawn to be "essentially disposed parallel" to the main piece – this exercise raises a threshold problem of determining at what point a tangent line is no longer "essentially parallel."  In any event, merely indicating that a tangent line *could* be drawn from a certain point on a curved surface to render it parallel to a straight line, does not, in fact, render those two points parallel.  Accordingly, the court respectfully rejects plaintiff's argument that an imaginary tangent line may be drawn in order to dispose the curved edge parallel to the center main piece and finds that the accused product lacks "prongs" with an outer portion "essentially disposed parallel" to an elongate main portion.

ii. <u>Claim 12</u>

Claim 12 does not require "prongs," but requires, "at least a pair of strap retaining members positioned at opposite end of the retainer, respectively, and an *elongated member* extending between the strap-retaining members."  (Compl. Ex. A, Col. 6.)  "Elongated member" as used in Claim 12 is used interchangeably with the term "elongate main portion" in Claims 1, 6 and 8.

Defendant argues that the accused product is missing an "elongate main portion" because the center portion of defendant's accused product is split, whereas an "elongate main portion" suggests a long, contiguous central piece.  (Def. Mem. at 11-12.)  Plaintiff argues that the '766 patent does not define "elongate main portion" or "elongated member" as being a single piece, but only that there is a "main central portion of the invention that is elongated."  (Pl. Opp. at 8.)  Plaintiff further contends that the claim language does not preclude splitting of elongated portion.  (*Id.*)  Defendant argues in its Reply that plaintiff is attempting to use a definition divorced from the context of the specification – and that even if a split main portion is possible, the phrase does not provide "explicit or implicit notice to the public."  (Def. Reply at 4.)

Under the court's claim construction, "elongate main portion" or "elongated member," used interchangeably in the

singular form, describes a main structure that is longer than it is wide, and that extends continuously across the opposite ends of the apparatus without any substantial break or gap. The court respectfully disagrees with plaintiff's contention that points A1, A2, A3, and A4 in Figure 2 together comprise the "elongate main portion," though split in defendant's accused product, because the center portion of the accused product does not extend across the product without a substantial break or split. Indeed, the split between points A1/A2 and A3/A4 in Figure 2 is significant. Moreover, the center pieces are not clearly the "main" piece of the structure, as sections C, D, E, and F of Figure 2, which comprise the outer circular frame of the structure, appear to comprise the "main" portion of the accused device, as the circular frame constitutes a majority of the accused device's structure. Accordingly, the court finds that that Claim 12 does not read on defendant's accused product, as there is no "elongated member" or "elongate main portion" present in defendant's accused product. Therefore, defendant's accused product does not contain the specific claim limitations of "prongs," and "elongate main portion" and does not literally infringe upon plaintiff's patent.

Based on the above construction of the claim, no reasonable jury could find literal infringement because the accused product is lacking claim limitations from each of the

independent claims.  Specifically, the accused product lacks "prongs" that are "disposed essentially parallel," much less a "pair of prongs," and lacks an "elongate main portion" or "elongated member" as defined in the claim construction *supra*. The court need not reach the other disputed terms, because in order for a patent claim to be infringed, each and every limitation in the claim must be present in the accused product. Accordingly, summary judgment is granted in favor of defendant with respect to plaintiff's claims of literal infringement.

**IV. Summary Judgment on the Doctrine of Equivalents**

    **A.    Legal Standard**

        i.    <u>Infringement Under the Doctrine of Equivalents</u>

        If literal infringement cannot be proven, a patent may still be infringed under the doctrine of equivalents. *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014); *Eastcott v. Hasselblad USA, Inc.*, 564 F. App'x 590, 594 (Fed. Cir. 2014) ("[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.").  A court may grant summary judgment of non-infringement in favor of defendant with respect to plaintiff's theory of infringement under the doctrine of equivalents if no reasonable factfinder could find

that "there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention." *Eastcott*, 564 F. App'x at 590 (citing *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 21 (1997)) ("[A] product or process that does not literally infringe upon the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention."); *see Wireless Ink*, 969 F. Supp. 2d at 325 ("To prove infringement under the doctrine of equivalents, a patentee must show that "there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.").

The purpose of the doctrine of equivalents is to "temper unsparing logic and prevent an infringer from stealing the benefit of the invention." *Festo Corp. v Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1366 (Fed. Cir. 2003). As such, the doctrine seeks to strike a balance between ensuring full protection for the patentee while simultaneously ensuring that the claims of the patent provide fair notice with regard to the patent's scope. *Id.*

When relying on the doctrine of equivalents to oppose a motion for summary judgment of non-infringement, "a patentee must provide particularized testimony and linking argument as to

the insubstantiality of the differences between the claimed invention and the accused device or process," or, when appropriate, the function-way-result test.[2] *AquaTex,* 479 F.3d at 1328 (citation and internal quotation marks omitted); *see Eastcott*, 564 F. App'x at 595; *Motionless Keyboard Co. v. Microsoft Corp.,* 486 F.3d 1376, 1382 (Fed. Cir. 2007); *Wireless Ink Corp.*, 969 F. Supp. 2d at 325; *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996) ("[A] patentee must . . . provide particularized testimony and linking argument as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents.").

The Federal Circuit has made clear that the evidence of equivalents must be from the perspective of someone skilled in the art, such as an expert or one versed in the technology or by documents, including texts and treatises. *Eastcott*, 564 F. App'x at 595; *AquaTex Indus., Inc. v. Techniche Solutions,* 479

---

[2] The doctrine of equivalents allows patent owners to prove infringement even where a device or process does not fall within the literal scope of a patent's claims. The courts have developed a number of tests for applying the doctrine of equivalents, the most common of which is the "function-way-result" test. *Graver Tank & Mfg. Co. v. Linde Air Prods.*, 339 U.S. 605 (1950). Under the function-way-result test, equivalence is met if an element in the accused product "performs substantially the same function, in substantially the same way, to achieve substantially the same result" as disclosed in the claim. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008).

F.3d 1320, 1329 (Fed. Cir. 2007). "Generalized testimony as to

the overall similarity between the claims and the accused

infringer's product or process will not suffice." *AquaTex,* 479

at 1328; *Texas Instruments*, 90 F.3d at 1566.

Indeed, the Federal Circuit explained in *AquaTex* that,

when the patent holder relies on the doctrine of equivalents

rather than literal infringement, he must meet additional

requirements in order to survive summary judgment.

Specifically:

> [W]hile many different forms of evidence may
> be pertinent, when the patent holder relies
> on the doctrine of equivalents, as opposed
> to literal infringement, the difficulties
> and complexities of the doctrine [of
> equivalents] require that evidence be
> presented to the jury or other fact-finder
> through the particularized testimony of a
> person of ordinary skill in the art,
> typically a qualified expert, who (on a
> limitation-by-limitation basis) describes
> the claim limitations and establishes that
> those skilled in the art would recognize the
> equivalents.

*AquaTex,* 479 F.3d at 1329; *see Eastcott*, 564 F. App'x at 594-95.

Accordingly, in *AquaTex* and its progeny, where the plaintiff

failed to provide particularized testimony from an expert or

person skilled in the art that specifically addressed

equivalents, and provided only lawyer argument and/or

generalized testimony about the accused product, the court

granted summary judgment of non-infringement under the doctrine

of equivalents for failure to show the existence of a genuine issue of material fact.  *AquaTex,* 479 F.3d at 1329; *see also Eastcott*, 564 F. App'x at 594-95 (affirming grant of summary judgment of non-infringement where plaintiff failed to provide the particularized testimony on a limitation-by-limitation basis to establish the existence of a genuine issue of fact regarding infringement under the doctrine of equivalents); *Motionless Keyboard,* 486 F.3d at 1382 (affirming grant of summary judgment of non-infringement because the patentee "did not provide any particularized testimony to show infringement under the doctrine of equivalents"); *Wireless Ink*, 969 F. Supp. 2d at 338 (granting summary judgment of non-infringement where plaintiff offered no evidence to support a theory of infringement under the doctrine of equivalents, much less the "particularized testimony and linking argument on a limitation-by-limitation basis" required under well-established precedent).

The doctrine of equivalents may be met in one of two ways.  *See Voda v. Cordis Corp.*, 536 F.3d 1311, 1326 (Fed. Cir. 2008) (noting that the Federal Circuit applies two articulations of the test for equivalence – the insubstantial differences test and the function-way-result test).  First, under the "insubstantial differences" test, a claim element is equivalently present in an accused device if only "insubstantial differences" distinguish the missing claim element from the

corresponding aspects of the accused device. *Id.*; *Sage Products, Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997); *Astra Aktiebolag v. Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 504 (S.D.N.Y. 2002) *aff'd sub nom. In re Omeprazole Patent Litig.*, 84 F. App'x 76 (Fed. Cir. 2003) ("The test for whether an element in the infringer's product or process is equivalent to a claimed element is whether the differences between the two are insubstantial to one of ordinary skill in the art."). Alternatively, under the function-way-result test, equivalence is met if an element in the accused product "performs substantially the same function, in substantially the same way, to achieve substantially the same result" as disclosed in the claim. *Voda*, 536 F.3d at 1326; *Spiel Associates*, No. 03-CV-4696, 2010 WL 546746, at *8 (citing *Abbott Labs. v. Sandoz, Inc.,* 566 F.3d 1282, 1296-97 (Fed. Cir. 2009)) (internal citations omitted); *see Am. Calcar, Inc. v. Am. Honda Motor Co., Inc.,* 651 F.3d 1318, 1338 (Fed. Cir. 2011) (citation and internal quotation marks omitted).

Further, the use of a substitute with "known interchangeability" with a literally claimed element is an objective factor to be considered in determining equivalence. *Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. at 36; *Ring & Pinion Serv. Inc. v. ARB Corp.*, 743 F.3d 831, 834 (Fed. Cir. 2014) (citing cases). The "known interchangeability" test

looks to the knowledge of the skilled artisan to see whether the artisan would "contemplate the interchange as a design choice." *Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1383 (Fed. Cir. 2001). "An important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was." *Graver Tank & Mfg. Co. v. Linde Air Products Co.,* 339 U.S. 605, 609 (1950). Proof of interchangeability must be proffered "through testimony of experts or others versed in the technology; by documents, including texts and treatises; and, of course, by the disclosures of the prior art." *Id.* at 609.

Because "the doctrine of equivalents necessarily adds uncertainty to the scope of patent claims, and thereby detracts from the public-notice function of patent claims and risks deterring non-infringing and potentially innovative endeavors," courts have developed rules that "constrain when and how the doctrine of equivalents is to be applied." *Freedman Seating Co. v. Am. Seating Co.,* 420 F.3d 1350, 1358 (Fed. Cir. 2005) (citing *Festo,* 535 U.S. at 727). First, the "all-elements rule" establishes "that an accused product or process is not infringing unless it contains each limitation of the claim, either literally or by an equivalent." *Id.* Accordingly, equivalence under the doctrine of equivalents must be assessed

on a limitation-by-limitation basis, as opposed to from the perspective of the invention as a whole. *Gemalto*, 754 F.3d at 1374 (Fed. Cir. 2014) (quoting *Warner–Jenkinson,* 520 U.S. at 29) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.") (internal citation omitted); *AquaTex Indus., Inc. v. Techniche Solutions,* 479 F.3d 1320, 1328 (Fed. Cir. 2007) ("[E]vidence [of infringement under doctrine of equivalents] must be presented on a limitation-by-limitation basis."). Second, "an element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation." *Freedman Seating,* 420 F.3d at 1358. "[C]ourts must consider the totality of the circumstances of each case and determine whether the alleged equivalent can be fairly characterized as an insubstantial change from the claimed subject matter without rendering the pertinent limitation meaningless." *Id.* at 1359.

      ii.   Defendant's Alleged Defenses to the Doctrine of Equivalents

      a.   *Ensnarement of Prior Art*

      The doctrine of equivalents cannot be applied in a manner that would "ensnare" or encompass the prior art as the

Federal Circuit "has consistently limited the doctrine of equivalents to prevent its application to ensnare prior art." *Gemalto*, 754 F.3d at 1374-75 (citing *Marquip, Inc. v. Fosber Am., Inc.,* 198 F.3d 1363, 1367 (Fed. Cir. 1999) (internal citation omitted); *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009) ("Ensnarement bars a patentee from asserting a scope of equivalency that would encompass, or 'ensnare,' the prior art.") (internal citations omitted). In other words, a patentee cannot assert a range of equivalents that encompasses prior art. In *Marquip,* the Federal Circuit recognized that "[b]ecause prior art limits the exclusive right available to an inventor, it also limits the range of permissible equivalents of a claim." *Marquip, Inc. v. Fosber Am., Inc.,* 198 F.3d 1363, 1367 (Fed. Cir. 1999). Accordingly, a plaintiff may not advance a theory of infringement under the doctrine of equivalents that captures, or ensnares, prior art.

The burden of producing evidence of prior art to challenge a hypothetical claim rests with an accused infringer, but the burden of proving patentability of the hypothetical claim rests with the patentee. *Interactive Pictures*, 274 F.3d at 1380 (citing *Streamfeeder, LLC v. Sure-Feed, Inc.,* 175 F.3d 974, 984 (Fed. Cir. 1999). In conducting an ensnarement defense analysis, a court may first construct a hypothetical claim that

would literally cover the accused device, then assess the relevant prior art to determine whether the plaintiff has carried its burden of persuading the court that the hypothetical claim would still be patentable over the prior art. *DePuy Spine*, 567 F.3d at 1325 (citing *Interactive Pictures*, 274 F.3d at 1380). Ultimately, "[i]f such a claim would be unpatentable under the applicable statute, then the patentee has overreached, and the accused device is noninfringing as a matter of law." *Id.* Ensnarement, like prosecution history estoppel, is "to be determined by the court, either on a pretrial motion for partial summary judgment or on a motion for judgment as a matter of law at the close of the evidence and after the jury verdict." *DePuy Spine*, 567 F.3d at 1324 (quoting *Warner–Jenkinson,* 520 U.S at 39 n.8.).

b.  *Prosecution History Estoppel*

Prosecution history estoppel prevents a patentee from recapturing through the doctrine of equivalents the subject matter that the applicant surrendered during prosecution. *Integrated Tech. Corp. v. Rudolph Technologies, Inc.*, 734 F.3d 1352, 1356 (Fed. Cir. 2013) *cert. denied*, 134 S.Ct. 2873 (2014) (citing *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.,* 535 U.S. 722, 734 (2002); *Pall Corporation v. Micron Separations,* 66 F.3d 1211, 1218 (Fed. Cir. 1995) ("Prosecution history estoppel limits infringement by otherwise equivalent structures, by

barring recapture by the patentee of scope that was surrendered in order to obtain allowance of the claims.").  "There is a presumption that prosecution history estoppel applies when a patentee files an amendment seeking to narrow scope of claim and the reason for amendment was a substantial one relating to patentability."  *Festo*, 344 F.3d at 1366.  Thus, a patentee may not "recapture through equivalence . . . coverage given up [by argument or amendment] during prosecution."  *Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1564 (Fed. Cir. 1990).

The patentee bears the burden of overcoming this presumption by "showing that the [narrowing] amendment does not surrender the particular equivalent in question."  *Id.* at 740; *accord, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1349–50 (Fed. Cir. 2002).  The patent owner may rebut a defense of estoppel by establishing one of three exceptions by a preponderance of the evidence: (1) the alleged equivalent could not reasonably have been described at the time the amendment was made; (2) the alleged equivalent was tangential to the purpose of the amendment; or (3) the equivalent was not foreseeable (and thus not claimable) at the time of the amendment.  *Integrated Tech.*, 734 F.3d at 1356.

The Federal Circuit explained in *Festo,* 344 F.3d at 1366, that the "first question in a prosecution history estoppel

inquiry is whether an amendment filed in the Patent and

Trademark Office ("PTO") has narrowed the literal scope of a

claim." *Festo,* 344 F.3d at 1366 (citing *Pioneer Magnetics, Inc.*

*v. Micro Linear Corp.,* 330 F.3d 1352, 1356 (Fed. Cir. 2003)).

The scope of the prosecution estoppel depends on "the inferences

that may reasonably be drawn from the amendment." *Festo,* 535

U.S. at 737–38.  If the court finds that the amendment did not

narrow the literal scope of the claim, prosecution history

estoppel will not apply.  If, however, the accused infringer

establishes that the amendment was a narrowing one, then the

court must determine whether "the reason for that amendment was

a substantial one relating to patentability." *See id.*  "[E]ven

if the amendment's purpose were unrelated to patentability, the

court might consider whether it was the kind of reason that

nonetheless might require resort to the estoppel doctrine," as

"a narrowing amendment made to satisfy any requirement of the

Patent Act may give rise to an estoppel." *Id.* at 735–36.  "If

[an] amendment is truly cosmetic, then it would not narrow the

patent's scope or raise an estoppel.  On the other hand, if [an]

amendment is necessary and narrows the patent's scope — even if

only for the purpose of better description — estoppel may

apply." *Id.* at 736–37.

When the prosecution history record reveals no reason

for the narrowing amendment or the court is unable to discern

the purpose underlying an amendment narrowing a claim limitation, the court shall presume, for the purposes of estoppel, that the patentee had a substantial reason relating to patentability. *Id.* at 740. Thus, the patentee bears the burden of overcoming this presumption by "showing that the [narrowing] amendment does not surrender the particular equivalent in question." *Id.* at 740; *accord, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.,* 299 F.3d 1336, 1349-50 (Fed. Cir. 2002). Whether prosecution history estoppel applies, and whether the rebuttal of the presumption of surrender has been met, are questions of law for the court, not a jury, to decide. *Integrated Tech.*, 734 F.3d at 1356 (citing *Chimie v. PPG Indus. Inc.,* 402 F.3d 1371, 1376 (Fed. Cir. 2005)); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1368 (Fed. Cir. 2003).

## B.  **Application**

### i. Infringement Under the Doctrine of Equivalents

Plaintiff argues that defendant's accused product infringes upon the '766 patent under the doctrine of equivalents. Defendant, however, argues that plaintiff's "proofs on equivalence" are insufficient to support a finding of infringement under the doctrine of equivalents because plaintiff has failed to set forth any "particularized testimony and linking argument" of a person of ordinary skill in the art. *See*

*AquaTex Indus., Inc. v. Techniche Solutions,* 479 F.3d 1320, 1328 (Fed. Cir. 2007). Plaintiff argues that it has shown that the structures of the accused product and the patent are interchangeable as devices to adjust the length of a single bra strap and to secure straps on a user's back. Thus, plaintiff contends that it has set forth highly probative evidence of infringement under the doctrine of equivalents sufficient to defeat defendant's motion for summary judgment, and that such evidence should be presented to a jury. (Pl. Opp. at 11.)

As an initial matter, the structural simplicity of both plaintiff's and defendant's devices weighs against finding infringement under the doctrine of equivalents. Indeed, "[c]ourts have resisted finding infringement under the doctrine of equivalents when the claimed invention is a simple structural device that can be easily described in words. This is so because one justification for the doctrine of equivalents is that words often fail to do an invention justice." *Van Blarcom Closures, Inc. v. Owens-Illinois, Inc.*, 507 F. Supp. 2d 214, 228-29 (E.D.N.Y. 2007) (recommending a finding of non-infringement under the doctrine of equivalents and noting that "where the claimed invention is a simple structural device in an already crowded art, and the claim limitations are clearly stated and sharply defined, and the variation presented by the accused device was foreseeable to the patent drafter, there may

indeed be few, if any, infringing equivalents."); *Street Flyers LLC v. Gen-X Sports, Inc.*, 2003 WL 21998960, at *13 (S.D.N.Y. Aug. 22, 2003) (granting summary judgment of non-infringement under doctrine of equivalents where plaintiff failed to write its claim to cover shoes with spring biasing the wheels in either direction and therefore could not claim equivalence where accused product's wheels contained springs biased in opposite direction of those in plaintiff's product).

Plaintiff appears to assert both an "insubstantial differences" and "function-way-result" equivalence theory. (*See* Pl. Mem. at 9, 13.) Plaintiff also cites prior art to advance its argument that "the known interchangeability of the accused and claimed elements is potent evidence that one of ordinary skill in the relevant art would have considered the change insubstantial." (Pl. Mem. at 10.) Plaintiff references its Rule 56.1 Statement of Facts to assert that U.S. Patent Numbers 2,278,153 (the "Shaulson Patent," attached to the Dunne Declaration at Exhibit 6) and 1,769,753 (the "Reuter Patent," attached to the Dunne Declaration at Exhibit 7) disclose structures very similar to the plaintiff's product, and that European Patent Number EP1051926A1 (the "Fildan reference," attached to the Spencer Declaration as Exhibit D) discloses a structure very similar to the structure of defendant's accused product. (Pl. Mem. at 10 (citing Plaintiff's Statement of Facts

¶¶ 2-4).)  Specifically, plaintiff compares an illustration of
the Reuter Patent (depicted below as Figure 3) and an
illustration of the Shaulson Patent (depicted below as Figure
4),

 

Figure 3: Reuter Patent          Figure 4: Shaulson Patent
(Dunne Decl. Ex. 7)              (Dunne Decl. Ex. 6)

which resemble plaintiff's product, with an illustration of the
Fildan Reference (depicted below as Figure 5), which resembles
defendant's accused product,



Figure 5a: Fildan Reference
(Spencer Decl. Ex. D)

to contend that the "respective structures [of these devices]
are 'potent evidence' to establish that they are known
equivalents in the technical field of retainers for use with the
straps of a brassiere."  (Pl. Mem. at 11.)

        Plaintiff argues that both types of structures
depicted in these three devices may be used for the same purpose

– adjusting a single bra strap – therefore "it is known in the
field that the unitary member can be the exterior 'prongs' or
the central 'elongated member'" such that "[e]ither
configuration works, and both perform the same function, in
order to achieve the same result, in the same way." (Pl. Opp.
at 13.) Plaintiff extends this reasoning to the brassiere strap
retainers at issue in the instant case to conclude that "[w]hile
[the Reuter, Shaulson and Fildan] devices are designed to be
used to adjust the length of a single bra strap and do not
disclose how to secure two bra straps together . . . [p]laintiff
has demonstrated the interchangeability of the basic structures
of the accused device of Brazabra and the patented device
[which] is highly probative evidence of infringement under the
doctrine of equivalents that properly should go to the jury."
(Pl. Opp. at 11.)

        Although "[t]he known interchangeability of
substitutes for an element of a patent is one of the express
objective factors . . . bearing upon whether the accused device
is substantially the same as the patented invention," *Warner–
Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. at 36, and
disclosures of prior art may be sufficient evidence, the court
is unpersuaded. First, as indicated in *Warner–Jenkinson,* known
interchangeability is not dispositive, and is only *one* factor to
consider in a doctrine of equivalents analysis that may assist a

fact-finder in assessing the similarities and differences between a claimed and an accused element. *Warner-Jenkinson,* 520 U.S. at 37 ("A skilled practitioner's knowledge of the interchangeability between claimed and accused elements . . . tells the fact-finder about the similarities or differences between those elements"). Second, "the question of known interchangeability is not whether both structures serve the same function, but whether it was known that one structure was an equivalent of another." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1309 (Fed. Cir. 1998). Thus, though relevant, the fact that devices for a single brassiere strap adjustment exist in alternative formations similar to that of the plaintiff's device and the accused device does not provide "potent evidence" that there is a "known interchangeability" between "pairs of prongs" and an "elongate main member" in a device used to retain two brassiere straps on a user's back.

Further, the fact that one device may be interchanged with another with a different configuration, does not establish "known interchangeability" for each of the claim limitations specified in plaintiff's patent. "Known interchangeability" must be assessed on a limitation-to-limitation basis and plaintiff is required to set forth evidence showing that the each of the parts of the accused product are known substitutes

for each of the claim limitations set forth in plaintiff's patent, specifically that the center pieces (points A1, A2, A3, and A4 of Figure 1) in the accused device are known substitutes of the "main elongate portion" in plaintiff's device, and that the circular outer frame (points C, D, E, and F of Figure 2) of the accused product is a known substitute of the "prongs" in plaintiff's device.

Moreover, plaintiff's argument that the Shaulson, Reuter, and Fildan Patents disclose structures that are interchangeable with one another and similar to that of the patent-in-suit and the accused product does not provide "particularized evidence" on a "limitation-to-limitation" basis to create a genuine issue of material fact as to whether the accused device infringes plaintiff's device by equivalents. *See Warner-Jenkinson Co. v. Hilton Davis Chemical Co.* 520 U.S. at 29 (noting that a doctrine of equivalents analysis must be applied to the individual claim limitations, not to the invention as a whole). Nor does plaintiff's theory address all the claim limitations in the patent-in-suit. Indeed, plaintiff does not offer any evidence, testimony, or even argument regarding the claim limitation that "each of said prongs . . . is essentially disposed parallel" or that "each of said end portions includes a pair of prongs." (Compl. Ex. A.) Plaintiff merely argues in a conclusory fashion, and without explanation, that the accused

product and the patent-in-suit's "respective structures are 'potent evidence' to establish that they are known equivalents in the technical field of retainers for use with straps of a brassiere" and that "[p]laintiff has demonstrated the interchangeability of the basic structures of the accused device of Brazabra and the patented device."  (Pl. Mem. at 11.)

The court is equally unpersuaded by plaintiff's argument that "by splitting the elongated member . . . the accused Brazabra Clip merely results in a reversal of parts" and that "[t]he art of bra accessories has long recognized that such reversal of parts are equivalent forms to provide the function (holding the bra strap) in the same way (by providing a gap between an elongate member and a curved member extending away) to get the same result (a bra strap held firmly in a secured position)."  (Pl. Opp. at 13.)

Plaintiff again argues in a conclusory fashion that the "main elongate portion" and "prongs" contained in plaintiff's device and different structures in the accused device represent a "reversal of parts" sufficient to establish infringement under the doctrine of equivalents.  Further, although plaintiff fails to cite any case law in support of its argument regarding the reversal of parts, the court finds that the prevailing case law regarding the reversal or transposition of claim limitations is not applicable to the devices at issue

here.  For example, in *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1332 (Fed. Cir. 2001), the Federal Circuit affirmed the district court's finding of non-infringement and rejected plaintiff's argument under a theory of equivalents that the accused product was merely a reciprocal change from the claimed product.  *Id.*  In *DeMarini*, the claimed product was a baseball bat comprised of a hollow tubular bat frame with an interior insert, whereas the accused product was a baseball bat comprised of a double-walled bat frame with an exterior shell.  *Id.*  The plaintiff in *DeMarini* argued that the accused bat achieved "the same function (increasing the trampoline deflection), in substantially the same way (with a leaf-spring-like action), to achieve substantially the same result (improved hitting performance)."  *Id.* at 1333.  Although the plaintiff contended that "like the accused infringing device in *Corning Glass Works v. Sumitomo Electric U.S.A., Inc.,* 868 F.2d 1251, 9 USPQ2d 1962 (Fed. Cir. 1989), [defendant's] bat presented a classic example of transposition of two elements," the Federal Circuit disagreed.  *DeMarini*, 239 F.3d at 1332.  The Federal Circuit reasoned that, unlike the reversal of parts in *Corning Glass*, in which "no structural claim limitations were rearranged, only the relative characteristics of the structures were reciprocally changed," the difference between the bats "involve[d] a structural rearrangement and redefinition of claim limitations

66

in which the functional relationships of these structural limitations is not maintained."[3] *Id.* The *DeMarini* court determined that if the claimed invention's bat insert was interposed as the exterior shell of the accused product, the frame of the accused product would no longer be available for impact by the ball. *Id.* Thus, although reciprocal changes may, in some cases, support a finding of infringement under the doctrine of equivalents, the rearrangement of structural claim limitations does not. *Id.* (noting that "*Corning Glass* does not authorize rearrangement of structural claim limitations").

Moreover, the Federal Circuit has held that a patent that "claims a precise arrangement of structural elements that cooperate in a particular way to achieve a certain result" is not infringed by an accused product that achieves the same result "by a different arrangement of elements." *Sage Prods.,*

---

[3] In *Corning Glass,* the patented invention involved an optical fiber featuring a core containing a positive dopant in excess of the cladding around the core, which created a positive refractive index ("RI") differential to transmit light signals. 868 F.2d at 1255. The accused device retained both a core and cladding layer, however, the core contained no dopant and the surrounding cladding contained a negative dopant, which similarly resulted in a positive RI differential to transmit light signals. *Id.* Both devices retained a core, cladding, and dopant to maintain a positive RI differential between the structures. *Id.* Thus, the court upheld the district court's determination that the addition of negative dopant to the cladding layer in the accused product was the equivalent of adding positive dopant to the core in the patented product. The court noted that the insubstantial change merely substituted a known alternative way to achieve the same result and perform the same function of achieving a refractive index differential. *Id.* Thus, in *Corning,* no structural claim limitations were rearranged, only the relative characteristics of the structures were reciprocally changed.

*Inc. v. Devon Indus., Inc.,* 126 F.3d 1420, 1425 (Fed. Cir. 1997). In *Sage,* the Federal Circuit held that a patent for a container used for the safe disposal of medical instruments, which claimed an elongated slot *on the top* of the container body, was not literally infringed by an accused device that had an elongated slot *within* the container body. *Id.* at 1423. Focusing on the fact that the patent claimed "an elongated slot *at the top of the container body,*" *id.* at 1422, the court noted that the slot on the accused device was "not 'at the top of the container body.'" *Id.* at 1423. The court reasoned that, because Sage had failed to seek a claim with "fewer structural encumbrances," it could not later expand the scope of its patent to argue infringement under the doctrine of equivalents to encompass products that employed different structural arrangements. *Id.*

Here, plaintiff argues the "reversal of parts" between the "main elongate portion" and the "prongs" of the patent-in-suit weighs in favor of a finding that defendant's product – which purposefully uses a reciprocal arrangement from plaintiff's product – infringes under a theory of equivalence. (Pl. Mem. at 12-13.) Plaintiff's patent, however, specifies a structural arrangement where the "main elongate portion" extends across the ends of the device, and envisions a "pair of prongs . . . extending outwardly from opposite ends." (Compl. Ex. A.)

Moreover, each "pair of prongs" is "disposed essentially parallel" to the "main elongate portion." Thus, to transpose the "main elongate portion" with the "pair of prongs" would not be a simple transposition in which "no structural claim limitations were rearranged, only the relative characteristics of the structures were reciprocally changed." *DeMarini*, 239 F.3d at 1333.

It is not apparent to the court how to contemplate a reversal of parts that would maintain the device's strap retaining functionality or to compare such a configuration with the accused product, when the accused product does not contain "parts" or structures identical to those in the plaintiff's device that could or are reversed or transposed. Indeed, because plaintiff's patent specifies a main center piece with a pair of prongs at each end to retain brassiere straps, a "reversal of parts" would require that the position of the elongate main portion and the pair of prongs be reversed. Plaintiff has not explained or illustrated to the court how it envisions a reversal of parts with respect to its patent specification and the accused product. Rather, plaintiff merely asserts that the "unitary element," to maintain the structure of the device, and "split element," to allow entry in to the gaps, may be interchanged to achieve the same result. (Pl. Mem. at 13.) Plaintiff's patent specification, however, does not

disclose only a "unitary portion" and "split element," but rather specifies a "pair of prongs" at opposite ends of an "elongated main portion." (Compl. Ex. A. Cols. 5-6.) Plaintiff may not now generalize its claim limitations to expand the scope of its claims in order to assert a reversal of parts theory of equivalence.

Beyond relying on prior art as evidence of "known interchangeability," as discussed *supra,* plaintiff has not provided particularized evidence to explain on a limitation-to-limitation basis how the accused product is equivalent to plaintiff's patent-in-suit as required under established precedent to defeat a motion for summary judgment. *See, e.g., Eastcott*, 564 F. App'x at 594-95 (affirming grant of summary judgment of non-infringement where plaintiff failed to provide the particularized testimony on a limitation-by-limitation basis to establish the existence of a genuine issue of fact regarding infringement under the doctrine of equivalents); *Gemalto*, 754 F.3d at 1374 (citing *Texas Instruments,* 90 F.3d at 1567) (noting that particularized testimony and linking argument "assure that the fact-finder does not, 'under the guise of applying the doctrine of equivalents, erase a plethora of meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement.'"); *AquaTex,* 479 F.3d at 1328 (finding lawyer argument and

generalized testimony about the accused product insufficient to defeat a motion for summary judgment on non-infringement where infringement was alleged under doctrine of equivalents); *Stumbo*, 508 F.3d at 1365 (granting summary judgment of non-infringement where patentee failed to raise any genuine issues of material fact where expert declaration only stated in a conclusory fashion that flap openings on the accused and patented product were not "significantly different" without explaining "how either opening operated or how the differences were insubstantial."); *Motionless Keyboard,* 486 F.3d at 1382 (same); *Network Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005) (granting summary judgment of non-infringement where expert declaration and other evidence relied upon by plaintiff were generalized and did not provide particularized testimony and linking argument on a limitation-by-limitation basis); *Wireless Ink*, 969 F. Supp. 2d at 338 (same).

Indeed, plaintiff has not proffered any expert testimony on infringement, which is "typically" required to prove infringement under the doctrine of equivalents. *AquaTex Indus.*, 479 F.3d 1329. For the most part, plaintiff, in a conclusory and generalized fashion, asserts legal arguments, in the form of a memorandum of points and authorities, a statement of facts, a claim construction, and a declaration from plaintiff's counsel, Gerard Dunne, in support of its argument

that defendant's accused product infringes plaintiff's patents
under the doctrine of equivalents.  This type of evidence,
without more, is insufficient.  *See, e.g., Eastcott*, 564 F.
App'x at 590 (plaintiff's own deposition testimony  and two
affidavits in opposition to defendant's summary judgment motion
did not constitute particularized testimony); *AquaTex,* 479 F.3d
at 1328 (finding lawyer argument and generalized testimony about
the accused product insufficient to demonstrate a genuine issue
of material fact to defeat summary judgment); *TechSearch,* 286
F.3d at 1371–72 (noting that "[t]he mere recital . . . that the
accused device performs 'the same function, in the same way, to
achieve the same result,' without more, does not create a
genuine issue of material fact as to whether an accused device
infringes by equivalents") (internal citation omitted).

     In sum, plaintiff fails to set forth "particularized
testimony and linking argument on a limitation-by-limitation
basis" under well-established precedent, and in any event has
not set forth sufficient evidence to raise a genuine issue of
material fact to defeat a motion for summary judgment on non-
infringement under a doctrine of equivalents.  "The doctrine of
equivalents is not a talisman that entitles a patentee to a jury
trial on the basis of suspicion; it is a limited remedy
available in special circumstances, the evidence for which is
the responsibility of the proponent." *Schoell v. Regal Marine*

*Indus., Inc.,* 247 F.3d 1202, 1210 (Fed. Cir. 2001).

Accordingly, summary judgment is granted with respect to plaintiff's infringement claim under the doctrine of equivalents.

      ii.  <u>Applicable Defenses to Plaintiff's Theory of Infringement Under the Doctrine of Equivalents</u>

Moreover, even assuming, *arguendo*, that plaintiff had sufficiently provided particularized testimony or other evidence to explain on a limitation-by-limitation basis how defendant's accused product is equivalent to plaintiff's, because the affirmative defenses to claims under the doctrine of equivalents – prosecution history estoppel and ensnarement – are also questions of law, the court may grant summary judgment in favor of non-infringement upon a finding that either of these defenses exist and have not been sufficiently rebutted by plaintiff.

Defendant argues that plaintiff's theory of infringement under the doctrine of equivalents is improper because it ensnares prior art, including the Fildan Clip and the Wyeth Patent.[4]  (Def. Mem. at 16; Def. Reply at 8.) *Gemalto*, 754 F.3d at 1374-75.  The Fildan reference refers to European Patent

---

[4] The Wyeth patent refers to U.S. Patent No. 1,401,227 and is attached as Exhibit C to the Spencer Declaration. Defendant argues that "[j]ust as Brazabra's top structure is curved, so are Wyeth's prongs," thus plaintiff's construction of the term "essentially disposed parallel" to read onto an imaginary tangent line touching the accused product would improperly encompass the Wyeth patent and it's prongs.  (Def. Mem. at 14-15.) Because the court finds that plaintiff's theory of equivalence would improperly ensnare the Fildan Reference, the court declines to reach the merits regarding whether the Wyeth Patent would likewise be ensnared.

Application 1,051,926 A1 and is attached as Exhibit D to the
Spencer Declaration.  The Fildan reference is a single
brassiere-strap slide or retainer that slides vertically to
tighten or loosen a bra strap.  As shown below, two
illustrations contained in the Fildan reference patent
specification depict two varying configurations of the Fildan
reference, one of which contains a split center portion, similar
to the center portion of defendant's accused product.

 

Figure 5a: Fildan Reference          Figure 5b: Fildan Reference
(Spencer Decl. Ex. D)                (Spencer Decl. Ex. D)

Defendant relies on the construction Fildan provides in Figure
4, which is split in the center so that a bra strap may be slide
through the gap.  (*See* Spencer Decl. Ex. D, Fig. 4.)

Defendant contends that its accused product is
identical to the Fildan reference, thus any attempt to capture
defendant's accused product under a theory of equivalence would
likewise ensnare the Fildan reference.  Plaintiff argues that
test for equivalents is objective and is a factual matter
reserved for the jury. (Pl. Opp. at 9.)  Moreover, plaintiff
argues that the Wyeth patent and Fildan reference do not

74

anticipate plaintiff's product or the accused product under plaintiff's theory of infringement. (Pl. Opp. at 13-15.) Specifically, plaintiff contends that the Fildan reference does not disclose a product adapted to secure two bra straps close together; instead it is intended to adjust a single strap. (Pl. Opp. at 15.) Plaintiff argues that the Fildan reference discloses a "bra-strap slider" which is adapted only to lengthen and shorten a single bra strap; thus, the scope of the Fildan reference does not anticipate a product created to retain two bra straps. (Pl. Opp. at 14-15.)

Defendant, however, contends that it is uncontested that Fildan discloses that accused product's clip shape, and that the actual size of the Fildan clip has no relevance, because the Fildan patent does not limit the size or dimensions of the product. Defendant has met its burden of producing evidence of prior art to challenge a hypothetical claim. *See Interactive Pictures*, 274 F.3d at 1380. Thus, the burden of proving patentability of the hypothetical claim rests with plaintiff. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1380 (Fed. Cir. 2001).

The Federal Circuit has recognized that a prior art reference need not demonstrate utility in order to serve as an anticipating reference. *In re Gleave*, 560 F.3d 1331, 1335 (Fed. Cir. 2009) ("A thorough reading of our case law, however, makes

clear that a reference need disclose no independent use or utility to anticipate a claim."); *Rasmusson v. SmithKline Beecham Corp.*, 413 F.3d 1318, 1326 (Fed. Cir. 2005). Thus, that the Fildan clip was intended for one strap does not preclude a finding that the Fildan clip would be ensnared under plaintiff's theory of equivalence.

Here, defendant also introduces the prosecution history of U.S. Patent No. 6,381,752, ("Arrington Patent") to demonstrate a hypothetical claim that would cover defendant's accused product (prior to amendment), and to establish that the pre-amendment Arrington patent, which is structurally identical to defendant's accused product - was not patentable over Fildan. The Patent Office specified that the Fildan patent disclosed a device used with a brassiere that included a "ring plate" with an "unobstructed center portion," and connected sides and free edges, through which a bra strap could be inserted. (Spencer Reply Decl., Ex. K, Rejected at 3-4.)

 

Figure 6a: Arrington Patent      Figure 6b: Arrington Patent
(Spencer Reply Decl. Ex. K)      (Spencer Reply Decl. Ex. K)

The Patent Office also noted that Fildan disclosed an elliptical

or oval shape, and that nothing prevented Fildan from being used

for retaining "one element . . . for both shoulder straps as

desired and as claimed." (*Id.*) Thus, the Patent Office

rejected the Arrington Application's Claims 1 through 9 as

anticipated by Fildan, noting that Fildan could be used for one

or two brassiere straps despite the disparity in size. (*Id.*)

Because defendant's accused product does not contain the

specification in the Arrington patent which overcame the Patent

Office's rejection – namely that the panels (or prongs) are

situated on a different plane (*see* Figure 6b, Nos. 32 and 34) –

the Fildan clip anticipates the defendant's accused product and

plaintiff's product under plaintiff's proposed theory of

equivalence. (*See* Spencer Reply Decl. Ex. K.)

To the extent that plaintiff broadens the scope of its

specifications to capture defendant's accused product, the court

finds that it likewise captures or ensnares Fildan art.

Specifically, if the scope of the patent-at-issue's "prongs"

includes circle segments as plaintiff proposes, the Fildan

patent would likewise have "prongs," and, because the remainder

of the Fildan structure is identical to the patent-at-issue,

this theory of equivalence would encapsulate the Fildan patent.

Accordingly, plaintiff's theory of equivalence improperly

ensnares the Fildan patent.[5]  Because the court finds that

plaintiff's theory of infringement under the doctrine of

equivalence captures, or ensnares, the Fildan reference, the

court need not reach a determination on whether the Wyeth Patent

is also ensnared.  Defendant's motion for summary judgment on

the doctrine of equivalents is granted with respect to its

defense of ensnarement of the prior art.

**CONCLUSION**

For the foregoing reasons, the court finds that the

accused product does not infringe the patent-in-suit, either

literally or under a theory of the doctrine of equivalents, and

**GRANTS** defendant's motion for summary judgment.  The Clerk of

the Court is respectfully directed to enter judgment in favor of

defendant and close this case.

---

[5] Defendant also argues that any claim of infringement under the doctrine of
equivalents is barred by prosecution history estoppel because the patentee
amended its patent during the patent application process to narrow the scope
of the claims, thus forfeiting the right to assert a claim that encompasses
certain limitations narrowed during the patent prosecution.  Specifically,
defendant argues that plaintiff is precluded from employing an interpretation
of the claim limitation "essentially disposed parallel" to encompass prongs
that are disposed with a curvature equal or greater than the prongs depicted
in the Wyeth patent.  (Def. Mem. at 14; Def. Reply at 6.)  Defendant further
contends that plaintiff is unable to establish any of the three exceptions to
rebut the presumption that prosecution history estoppel applies as a matter
of law.  *See Integrated Tech.*, 734 F.3d at 1356.  Because plaintiff has
neither produced "particularized testimony and linking argument on a
limitation-by-limitation basis," and, in any event, is estopped from
advancing its theory of equivalence due to its ensnarement of prior art, the
court need not reach a determination regarding whether plaintiff is estopped
from advancing a claim of equivalence by its prosecution history.

SO ORDERED.


Dated:   September 4, 2015
         Brooklyn, New York


                                    _____/s/_____
                                    **Kiyo A. Matsumoto**
                                    United States District Judge

_____

[i] Text of Independent Claims 1, 6, 8 and 12:

Claim 1:   A bra strap retainer comprising: a retaining member having
           an ***elongate main portion and opposite end portions
           positioned at opposite ends of main portion***. Wherein each
           of said end portions includes a pair of prongs, ***each prong
           of a said pair of prongs extending outwardly from opposite
           sides of said main portion*** in substantially opposite
           directions, said prongs being spaced from said elongate
           main portion to define a slot there between; wherein ***one
           said prong of a first said pair of prongs extends inwardly
           toward another one said prong of a second said pair of
           prongs***; wherein said main portion and said prongs of said
           end portions are all disposed in the same plane; wherein
           each of said prongs has an ***outer portion which is
           essentially disposed parallel to said elongate main
           portion***, said prongs and said elongate main portion being
           adapted to retain the straps of the bra there between with
           the straps being wound through said slots between said
           prongs and said elongate main portion.

Claim 6:   A bra strap retainer comprising: a retaining member having
           an elongate main portion and opposite end portions which
           are adapted to keep straps of a bra on a user's back in
           proximate relationship to one another, each of said end
           portions including prongs extending outwardly therefrom and
           being spaced from said elongate main portion thus defining
           a slot there between, said ***prongs being essentially
           disposed in a plane with said elongate main portion***, ***said
           prongs of each of said end portions extending outwardly
           from opposite sides of said elongate main portion, each of
           said prongs of a respective said end portion being curved
           and directed toward one of said prongs of the other said***

79

***end portion***, each of said prongs having an outer portion
which is essentially disposed parallel to said elongate
main portion, said prongs and said elongate main portion
being adapted to retain the straps of the bra there between
with the straps being wound through said slots between said
prongs and said elongate main portion, one of said end
portions being essentially C-shaped, and the other of said
end portions being essentially an inverted C-shape.

Claim 8.   In combination: a bra with a pair of shoulder straps each
having a rear section; and a bra strap retainer comprising:
***a retaining member having an elongate main portion and***
***opposite end portions which are adapted to keep straps of a***
***bra on a user's back in proximate relationship to one***
***another***, said retaining member engaging the body of the
straps without holes, eyelets, or loops being part of the
straps, each of said end portions . . . including prongs
extending outwardly therefrom and being spaced from said
elongate main portion thus defining a slot there between,
said prongs being essentially disposed in a plane with said
elongate main portion, said prongs of each of said end
portions extending outwardly from opposite sides of said
elongate main portion, each of said prongs of a respective
said end portion being curved and directed toward one of
said prongs of the other said end portion, each of said
prongs having an outer portion which is essentially
disposed parallel to said elongate main portion, one of
said end portions being essentially C-shaped, and the other
of said end portions being essentially an inverted C-shape;
wherein each of said shoulder straps extends inward of said
prongs of one of said opposite end portions with respect to
the body of a wearer of said bra such that each of said end
portions engages one of said shoulder straps; and wherein
each of said shoulder straps extends outward of said
elongate main portion with respect to the body of the
wearer of the bra such that said straps being wound through
said slots between said prongs and said elongate main
portion.

Claim 12. A method of preventing the slippage of bra straps off of
the shoulders of a person wearing a bra, comprising:
providing a bra strap retainer comprising at least a ***pair***
***of strap-retaining members positioned at opposite ends of***
***the retainer***, respectively, and ***an elongated member***
***extending between the strap-retaining members***; positioning
the bra strap retainer in the back region of the person,
between the straps of a bra being worn by the person;
placing a first bra strap into a retained position by
placing the strap in a first pair of slots located between

the strap-retaining members and the elongated member; and placing a second bra strap into a retained position by placing the strap in a second pair of slots located between the strap-retaining members and the elongated member; wherein the bra strap retainer brings the first and second straps in close proximity with each other in a location on the person's back, thereby preventing the straps from slipping of the person's shoulder.